## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MAURICE D. BLACK,

      Plaintiff,

      v.

                                           Case No. 4:24-cv-13417
                                           HON.

DIRECTOR HEIDI E. WASHINGTON
and WARDEN FREDEANE ARTIS, *in
their official capacities, and*
SERGEANT CHARLES DRUMMER,
SERGEANT STEVEN KINASZ,
SERGEANT KYLE EDDY,
CORRECTIONS OFFICER WILLIAM
BOTOS, CORRECTIONS OFFICER
PETE HUTSON, and MDOC
CORRECTIONS STAFF MEMBERS
JANE/JOHN DOES 1-14, *in their
individual capacities*,

      Defendants.

---

Sarah S. Prescott (P70510)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
*Attorney for Plaintiff*
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplaw.com

---

## COMPLAINT AND JURY DEMAND

Plaintiff Maurice Black, through his attorneys, Salvatore Prescott Porter & Porter, PLLC, brings this Complaint for gross negligence and constitutional violations related to Defendants' failure to protect and render aid, failure to train and supervise, and conduct that shocks the conscience.

## PRELIMINARY STATEMENT

1.      The United States Constitution, through its Eighth and Fourteenth Amendments, requires prison officials to protect prisoners from violence at the hands of other prisoners.

2.      Neither the violent nature of prison, nor the severity of the crime for which a prisoner is convicted, absolves officials of their constitutional obligation to protect prisoners within their charge.

3.      As observed by the U.S. Supreme Court, "[h]aving incarcerated persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. . . . [G]ratuitously allowing the beating . . . of one prisoner by another serves no legitimate penological objectiv[e]." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotations and citations omitted).

4.      In April 2022, in a windowed common room of the Thumb Correctional Facility in Lapeer, Michigan, a prisoner named James Allen Wilford violently

assaulted Plaintiff Maurice Black until he was lying bloodied and unconscious on the floor.

5.      The attack took place in broad daylight, in a common area, within sight of prison guards and the omniscient watch of the prison's surveillance cameras.

6.      Wilford then dragged Plaintiff's body outside the room, leaving a human-sized trail of blood as he moved Plaintiff's prone and swiftly failing body to his cell.

7.      At no point during or immediately after the assault did prison officials separate the two men, nor did they timely render aid to Plaintiff, even though corrections officers knew about the fight and saw Plaintiff's limp and unconscious body in its aftermath.

8.      Plaintiff was left bloodied and unconscious for nearly two hours before any MDOC official sought medical assistance.

9.      As a result of Plaintiff's injuries and Defendants' failure to render immediate aid, Plaintiff was placed in a medically induced coma for months with a shunt inserted into his brain and a feeding tube into his stomach.

10.     Plaintiff's mother was urged to remove life support. She did not.

11.     Today, Plaintiff's condition has stabilized, but he still suffers from physical limitations, severe brain damage, memory loss, and emotional trauma from the assault.

12.    Mr. Wilford – Plaintiff's assailant – is being prosecuted in Lapeer County Circuit Court.

## PARTIES, JURISDICTION AND VENUE

13.    Plaintiff Maurice Black was, at all relevant times, a Michigan Department of Corrections prisoner confined in the Thumb Correctional Facility in Lapeer, Michigan. He remains incarcerated, now at the Parnall Correctional Facility.

14.    Defendant Heidi Washington is Director of the Michigan Department of Corrections. At all relevant times, Director Washington was employed by MDOC. Director Washington is, and was at all relevant times, responsible for the overall operation of MDOC, including the promulgation of MDOC's rules, regulations, policies, and procedures. Director Washington is sued in her official capacity.

15.    Defendant Fredeane Artis is Warden of MDOC's Thumb Correctional Facility. At all relevant times, Warden Artis was employed by MDOC and was the supervisory official in charge of the Thumb Correctional Facility. She is charged with the supervision of the detention staff. She was a policy maker with regard to the policies, customs and practices governing the Thumb Correctional Facility's operations. Warden Artis is sued in her official capacity.

16.    Defendants Sergeant Charles Drummer, Sergeant Steven Kinasz, Sergeant Kyle Eddy, Corrections Officer William Botos, Corrections Officer Pete Hutson, and Jane/John Doe Officers #1-5 were correctional officers at Thumb

Correctional Facility. They were therefore responsible for the care, custody, and protection of individuals, including Plaintiff. Their duties and responsibilities included the development and implementation of policies and procedures for the operation and management of the Thumb Correctional Facility. At all relevant times, they were employed by MDOC. The Defendant Officers are sued in their individual capacities.

17.     On information and belief, one of Jane/John Doe Officers #1-5 quit working with the Department of Corrections shortly after the assault on Plaintiff, described herein.

18.     Defendant MDOC Corrections Staff Members Jane/John Doe #6-10 were, at all relevant times, on information and belief, employed by the MDOC to work at the Thumb Correctional Facility and were responsible for the supervision, care, custody, and protection of its prisoners upon notification of a medical emergency, at the time of Plaintiff's attack (and subsequent period of non-treatment and improper treatment) by virtue of their involvement with either a critical incident response team or medical response team, however specifically styled. Members of this group may include both corrections officers and other potential titles, including counsellor, RUM, ARUS, nurse, aide, physician, etc. MDOC Corrections Staff Members Jane/John Doe #6-10 are sued in their individual capacities.

19.     Defendant MDOC Correction Staff Members Jane/John Doe #11-14

were, at all relevant times, on information and belief, employed by the MDOC to train and supervise the individuals identified above before or at the time of Plaintiff's attack by virtue of their roles in management or training. Jane/John Doe #11-14 are sued in their individual capacities.

20.     Each Defendant is a "person" within the meaning of 42 U.S.C. § 1983.

21.     At all relevant times each Defendant acted under color of law and within the scope of their employment.

22.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction as this action arises under the Constitution and laws of the United States.

23.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this district as this is the district in which a substantial part of the events or omissions giving rise to the claims occurred.

24.     Plaintiff filed several grievances regarding the assault described in this complaint. None resolved the issues raised.

## **GENERAL ALLEGATIONS**

25.     Plaintiff restates and incorporates here all previously stated allegations.

*Mr. Wilford Violently Assaults Plaintiff in a Common Area;*
*Defendants Fail to Intervene*

26.     In the spring of 2022, Plaintiff was feeling optimistic about his future.

27.     At the time, he was a 38-year-old man who had spent more than half of

his life behind bars following a felony murder conviction as a teenager.

28.     Over the course of his two decades of incarceration, however, Plaintiff had matured and grown and was in the process of getting his life back together.

29.     The future looked bright: he had taken classes while incarcerated and earned his high school diploma *and* a community college degree.

30.     He was engaged to be married to his high school sweetheart, with a wedding planned for later in 2022.

31.     And he was eyeing with anticipation May of 2027: the first date on which he would be eligible for release.

32.     Tragically, the entire trajectory of his life changed on April 10, 2022.

33.     That day, Plaintiff—who had found God while incarcerated—was participating in one of his regularly scheduled telephone Bible studies.

34.     During a 15-minute break from Bible study, Plaintiff walked over to a nearby common room (sometimes referred to by prisoners as the "TV room" or the "Lower Right Day Room") which was surrounded by glass windows, to warm up his tea in the microwave.

35.     There, Plaintiff was violently assaulted by a fellow prisoner, James Allen Wilford.

36.     Mr. Wilford was already known by prison officials and staff to be violent as he was a repeat offender, with a rap sheet including aggressive crimes

dating back to the 1990s.

37.    Indeed, witnesses interviewed by the Michigan State Police indicated that Mr. Wilford was known to be a "hot head" and that even the MDOC staff were afraid of him.

38.    The origins of the dispute remain unclear, but a verbal altercation between the two men soon turned physical at around 5:54 p.m.

39.    On information and belief, Mr. Wilford was intoxicated at the time of the assault, having consumed alcohol earlier in the day.

40.    Mr. Wilford punched Plaintiff, who fell backwards and slammed his head against the floor, knocking him unconscious.

41.    Plaintiff's clothes were soon stained with his own blood. On information and belief, he was bleeding from injuries to his head, nose, mouth, and ears.

42.    Mr. Wilford nonetheless continued to pummel Plaintiff with closed fists, and repeatedly kicked and stomped the Plaintiff, as he lay unconscious.

43.    Following the assault, Plaintiff lay bleeding on the floor for several minutes, by which point at the latest, on information and belief, the live security camera feed had either been reviewed or the need for aid was so visible and so patently obvious that a jury could conclude that it had been reviewed/visible.

44.    At around 5:58 p.m., Mr. Wilford moved Plaintiff's body to a chair and

exited the dayroom. Prisoners throughout the housing unit witnessed Plaintiff's body slumped motionless in the chair.

45.    Mr. Wilford returned to the dayroom at around 6:04 p.m. to continue assaulting Plaintiff.

46.    On information and belief, Defendant Correctional Officer Pete Hutson was stationed in Plaintiff's housing unit during the assault, but Officer Hutson did not intervene in response to the assault on Plaintiff.

47.    On information and belief, Officer Hutson did multiple rounds in the housing unit while Plaintiff lay bleeding in the dayroom, visible to Officer Hutson.

48.    According to multiple witnesses Hutson and/or other John Does saw the bloody scene, but did not render aid or call for help.

49.    Mr. Wilford, himself, was still agitated and angry as Plaintiff lay slumped in the dayroom.

50.    As one inmate-witness described his own attempts to calm the violent Mr. Wilford without help from authorities: "At this point Wilford didn't have no shirt on and he had blood all over him. The CO [believed to be Defendant Hutson] walked past as we arguin' . . . just keep on mosey' on."

51.    The named Corrections Officers and at least one or more of the Does were aware of the assault and its severity, but failed to render aid.

*Mr. Wilford Drags Plaintiff's Bloodied, Unconscious Body across the prison floor to his cell; Defendants fail to intervene*

52.   At around 6:22 p.m., Mr. Wilford dragged Plaintiff's body out of the dayroom to Plaintiff's cell on the other side of the building, smearing behind him a trail of blood.

53.   Plaintiff stood about five feet and ten inches tall and weighed about 207 pounds at the time.

54.   On information and belief, the movement of an unconscious, bloody, full-grown adult male through the halls of MDOC was not a sight the various named Defendants and party Does then on duty both in security and on the floor missed seeing.

55.   The Defendants on duty saw it and decided not to render aid.

56.   The trail of blood that followed Plaintiff's body down the hallway to his cell was clearly visible to anyone in the area.

57.   Upon arriving at Plaintiff's cell, Mr. Wilford attempted to hide Plaintiff's bloodied, unconscious body under a blanket.

58.   Mr. Wilford, ***covered in Plaintiff's blood***, spoke directly with a Corrections Officer, believed to be Defendant Hutson, about wanting to send out a kite.

59.   Prisoners do not normally walk around covered in blood.

60.   Nevertheless, Defendant Officer Hutson (or the other Defendant Doe

who was approached) did not bother to inquire about the blood covering Mr. Wilford.

61.    Nor did the Defendant who had been approached take any steps to intervene, investigate, or to render aid to whomever the blood belonged to, again consciously disregarding a glaring indicator of recent harm.

62.    Plaintiff remained under the blanket, bloodied and unconscious, for about 45 minutes, through multiple cell checks and counts, on information and belief.

63.    The purpose of cell checks and counts is to *account* for the presence and physical safety of each prisoner.

64.    On information and belief, Mr. Wilford and possibly others entered and exited Plaintiff's cell many times while Plaintiff lay, still bloody, unconscious, and suffering from a brain injury.

65.    A fellow inmate walking past heard what sounded like a burp coming from Plaintiff's cell.

66.    In fact, Plaintiff was choking to death on his own blood, on information and belief.

67.    Not wanting Plaintiff to choke, the inmate walked over to Plaintiff's cell and rolled Plaintiff's body over on his side, at which point a substantial amount of blood poured from Plaintiff's mouth.

68.     Another Good Samaritan prisoner, rightfully concerned that Plaintiff was close to death, ran and got the attention of Defendant Sergeant Charles Drummer at around 7:36 p.m.

69.     The Good Samaritan prisoner told Defendant Sergeant Drummer that Plaintiff was dying in his cell.

70.     In conscious disregard of this known and severe threat to Plaintiff—not to mention the information suggesting that a murder may have just occurred— Defendant Drummer did not scramble any sort of response team, and did not check on the situation himself with any urgency. Instead, he took his sweet time —around ten minutes—to go to Plaintiff's cell, not far away.

71.     Defendant Drummer only called for medical assistance *after* doing so.

72.     Per the MDOC's own Critical Incident Report, Sergeant Drummer called for medical assistance nearly two full hours after the assault had first began.

73.     Meanwhile, Plaintiff's assailant, Mr. Wilford, was apprehended in the Yard.

74.     Mr. Wilford was even then still visibly unhinged, yelling obscenities and "still drunk" at the time, according to witnesses.

*Defendants Ignored the Assault on Plaintiff*

75.     Throughout the duration of the assault, and for almost two hours afterwards, no MDOC employee intervened, rendered aid to Plaintiff, or called for

back-up or medical/emergency assistance.

76.     On information and belief, at least three supervisors were on duty—Sergeant Charles Drummer, Sergeant Steven Kinasz, and Sergeant Kyle Eddy. But none of these supervisors took any effort to ensure that the correctional officers were fulfilling their obligations to monitor the prisoners.

77.     Mr. Wilford's assault on Plaintiff took place in a visible common area in the housing unit.

78.     MDOC facilities use cameras to supervise the location of the assault from a central location.

79.     On information and belief, security camera footage recorded the assault and its aftermath: Mr. Wilford dragging the unconscious Plaintiff across the prison through a trail of his own bright red blood; Mr. Wilford stuffing Plaintiff's body back in his cell; Mr. Wilford entering and exiting the cell 15 times.

80.     Officers, including the officers named herein, were actively scanning the tapes of activities in the facility in real time.

81.     The Defendants who were present or in the camera room consciously ignored the known risk of grave harm to Plaintiff and abandoned him without rendering any assistance.

82.     On information and belief, although Defendant MDOC Corrections Staff Member Jane/John Does who were assigned to the Control Center observed

some or all of these activities (or parts that would have led any reasonable person to take action, inquire, or respond), the reality was that every Doe involved and on duty with responsibilities over the location of the above situation failed to notify anyone or otherwise intervene, in conscious disregard of an obvious and severe risk to Plaintiff.

83.    And upon information and belief, and in conscious disregard of an obvious and severe risk to Plaintiff, Defendant MDOC Corrections Staff Members who were assigned to various other positions around the prison where the injuries occurred, where the assailant was ranting, drunk, and bloody, all failed to investigate, render aid to Plaintiff, or otherwise intervene although they observed Mr. Wilford covered in blood and screaming obscenities in the facility and thus had knowledge that some kind of bloody altercation had recently occurred.

84.    Defendants failed to intervene as Plaintiff's prone, limp, visibly bloodied body lay slumped in the common room for **nearly 30 minutes**.

85.    Defendants failed to intervene as Mr. Wilford dragged Plaintiff's limp body across the building causing a trail of blood.

86.     Defendants failed to intervene as Plaintiff, approaching death, lay in his cell for **more than an hour**, even as his blood-soaked assailant spoke directly with a Defendant-corrections officer.

*Plaintiff is Transported to the Hospital and Miraculously Survives*

87.    EMTs arrived at around 7:54 p.m. and took Plaintiff to the hospital. By the time Plaintiff reached the hospital, over two hours had passed since the severe, life-threatening injury to his head.

88.    The medical Does delayed critical, necessary care for further hours after the initial injury was sustained.

89.    Plaintiff's injuries were life-threatening.

90.    Plaintiff's brain was swelling throughout the above delay.

91.    Plaintiff would eventually be placed into a medically induced coma.

92.    Despite being in a medically induced vegetative state, Plaintiff was shackled to his hospital bed.

93.    Plaintiff's mother was not notified of the assault the day it happened, and when she was finally permitted to see him, medical staff advised her that they did not think he would survive.

94.    On information and belief, Plaintiff was in a coma for at least three months.

95.    Miraculously, Plaintiff lived, but the physical and mental scars linger, in part due to insufficient rehabilitative treatment.

96.    Plaintiff had to re-learn how to walk and use the bathroom and continues to suffer from muscle weakness.

97.    He also struggles with headaches and severe memory and cognitive impairments.

98.    A neurologist who treated Plaintiff in the hospital has conveyed that Plaintiff is unlikely to ever return to full mental capacity.

*Defendants' Failures Violated Internal Procedures, but are Unfortunately Unsurprising in Light of Severe Overcrowding and Understaffing Issues*

99.    Defendants' failure to render aid to Plaintiff was in violation of MDOC Policy Directive 03.04.125, which states that "[e]mployees shall provide appropriate and timely response to medical emergencies consistent with the employee's training and the use of universal precautions."

100.    Yet this failure is unsurprising given the widespread documentation and media coverage of overcrowding and understaffing in MDOC facilities which has been exponentially increasing for several years.

101.    Indeed, Defendant Washington has acknowledged the risks created by overworked and insufficient staff in Michigan's prison systems.

102.    The union representing MDOC's corrections officers states that officers are "being forced to run prison operations with far less than the required number of officers, resulting in unsafe prisoner to officer ratios" and that "[o]fficers are forced to work alone in isolated areas, jeopardizing not only their safety but that of the prisoners."

103.    As a result, the union has requested that Governor Whitmer activate the

National Guard "to provide immediate custody support to prisons in dire need of it[.]" According to the union, these dire conditions have "persisted and worsened" since Governor Whitmer's tenure began in 2019.

104.   In October 2018, and then again in 2020, the union wrote letters to Director Washington, warning her of the severe staffing shortages. But not only did Director Washington fail to improve conditions, they worsened.

105.   With everyone well on notice that Thumb was dangerously understaffed, it was essential for supervisors to provide the few corrections officers who were present with adequate supervision and training. They intentionally did not do so.

106.   The wrongful acts and omissions of Defendants reflect the failure of Defendants Washington, Artis, Drummer, Kinasz, and Eddy to properly staff the prison and to provide the existing prison staff with the specific tools and training to handle the incarceration of violent inmates and to protect other prisoners from assault.

107.   Each particular individual Defendant bears specific and direct responsibility for the iterative failures to supervise, to respond to deadly harm, and to render immediate medical aid, because that Defendant either (a) was on site and saw enough to subjectively and objectively grasp that a serious medical emergency had occurred, yet did not act as the law requires in reasonable time, or (b) was an

individual in the chain of responsibility for the others in (a) and failed to supervise and/or train the present officers and staff on how to handle violent medical emergencies such that the events that unfolded were interrupted timely or at the barest minimum were addressed in reasonable time, after the fact.

108.   The incarceration of violent prisoners is a recurring circumstance within a correctional setting.

109.   The assault of other prisoners is a highly predictable consequence of the Defendants' failure to properly train and equip officers to deal with those circumstances.

## COUNT I
## EIGHTH AMENDMENT
### Cruel and Unusual Punishment: Failure to Protect
### 42 U.S.C. § 1983
(*against Defendants Drummer, Hutson, Kinasz, Eddy, Botos, and Does 1-10*)

110.   Plaintiff restates and incorporates here all previously stated allegations.

111.   Plaintiff had a clearly established constitutional right to be protected from the violence of other prisoners.

112.   There was a strong likelihood that Plaintiff would be seriously harmed by Mr. Wilford as a result of Mr. Wilford's violent criminal history, Mr. Wilford's access to alcohol, Mr. Wilford's known propensity for being a "hot head," Mr. Wilford's access to common areas at the same time as other inmates, and the egregiously under-trained and under-manned staffing situation at the Thumb

Correctional Facility.

113.   The risk of harm to Plaintiff was obvious.

114.   Defendants were aware of the strong likelihood that Mr. Wilford would seriously harm another prisoner, including Plaintiff.

115.   Defendants had facts showing a strong likelihood that Plaintiff would be and/or had been seriously harmed but refused to confirm whether those facts were true.

116.   Defendants consciously failed to take reasonable measures to prevent the assault despite the seriousness of the harm to Plaintiff.

117.   It would have been practicable for Defendants to take corrective action including supervising the individuals involved directly, confining Wilford to his cell, or transferring Wilford to a separate location.

118.   Defendants had no legitimate reason related to safety or security for failing to take corrective actions.

119.   Plaintiff would not have been harmed if Defendants had taken reasonable measures.

120.   Defendants acted at all times under color of law and with deliberate indifference and willful disregard for Plaintiff's rights and safety.

121.   At all times relevant, Defendants' actions cited above evinced malice, recklessness, and a callous and deliberate indifference to Plaintiff's federally

protected right to be free of cruel and unusual punishment, his right to be protected from harm, and his right to medical care that adequately treated Plaintiff's serious medical needs as Defendants knowingly allowed Plaintiff to be assaulted and then to suffer without adequate medical treatment, causing pain, suffering, deterioration of health and lifelong injuries that Plaintiff now suffers.

122.    As a direct and proximate cause of the Defendants' constitutional violations, Plaintiff suffered, among other things, battery, as well as ongoing emotional and psychological trauma, physical and cognitive limitations, mental anguish, pain and suffering, humiliation, degradation and emotional injury.

**COUNT II**
**EIGHTH AMENDMENT**
**Cruel and Unusual Punishment: Failure to Render Aid**
**42 U.S.C. § 1983**
(*against Defendants Drummer, Hutson, Kinasz, Eddy, Botos, and Does 1-10*)

123.    Plaintiff restates and incorporates here all previously stated allegations.

124.    Upon being violently assaulted, Plaintiff had a clearly established constitutional right to immediate aid, assistance, and care, including medical treatment.

125.    The need for someone, including Plaintiff, to obtain assistance, aid, and medical treatment after suffering a violent, bloody attack and being dragged, unconscious, across the prison is so obvious that even a person who is not medically trained *at all* would recognize that it requires emergency treatment.

126.   Due to observing the assault, Plaintiff's unconscious body, the trail of blood, Mr. Wilford covered in blood, Mr. Wilford entering and exiting Plaintiff's cell multiple times, and an agitated and bloodied Mr. Wilford pacing around the facility after the assault, Defendants understood Plaintiff had a serious medical need or strongly suspected facts showing a strong likelihood that Plaintiff had a serious medical need, but they failed and refused to confirm whether those facts were true in reasonable time.

127.   Each Defendant on duty at the location of the assault at the time of the assault consciously and intentionally chose not to render aid, assistance, and care despite subjectively and objectively knowing that Plaintiff needed immediate medical assistance.

128.   It would have been possible for Defendants to take corrective action, simply by calling an ambulance or seeking medical aid upon first seeing Plaintiff's bloody and beaten body.

129.   It would have also been possible for Defendant Drummer to take corrective action by swiftly calling an ambulance and scrambling an emergency response team upon first being informed of Plaintiff's dire condition.

130.   Defendants had no legitimate reason related to safety or security for failing to take corrective actions.

131.   Nevertheless, they did not bother to act on known information of an

emergency in a timely manner.

132.   Had Defendants taken reasonable measures, Plaintiff would not have suffered any of the harm that was due to delayed medical intervention.

133.   Defendants acted at all times under color of law and with deliberate indifference and willful disregard for Plaintiff's rights and safety.

134.   At all times relevant, Defendants' actions cited above evinced malice, recklessness, and a callous and deliberate indifference to Plaintiff's federally protected right to be free of cruel and unusual punishment, his right to be protected from harm, and his right to medical care that adequately treated Plaintiff's serious medical needs as Defendants knowingly allowed Plaintiff to be assaulted and then to suffer without adequate medical treatment, causing pain, suffering, deterioration of health and lifelong injuries that Plaintiff now suffers.

135.   As a direct and proximate cause of the Defendants' constitutional violations, Plaintiff suffered, among other things, battery, as well as ongoing emotional and psychological trauma, physical and cognitive limitations, mental anguish, pain and suffering, humiliation, degradation and emotional injury.

### COUNT III
### DEPRIVATION OF RIGHT UNDER THE EIGHTH AMENDMENT
### Failure to Train and Supervise
### 42 U.S.C. § 1983
(*against Defendants Washington, Artis, Drummer, Kinasz, Eddy, and Does 11-15*)

136.   Plaintiff restates and incorporates here all previously stated allegations.

137.   At all relevant times, Defendants Washington, Artis, Drummer, Kinasz, Eddy, and Does 11-15, as supervisory officers and officials of MDOC, by MDOC's policies, customs, and/or practices of failing to properly train and supervise corrections staff allowed, facilitated, and/or encouraged the individual Defendants to violate Plaintiff's constitutional right to protection and right to aid, assistance and treatment, in violation of the Eighth Amendment of the U.S. Constitution.

138.   Defendants Washington, Artis, Drummer, Kinasz, Eddy and Does 11-15 adopted, implemented, reinforced, and/or promulgated the aforementioned policies, customs, and/or practices, all of which were a proximate cause and/or moving force in the violations of Plaintiff's constitutional rights.

139.   Defendants Washington, Artis, Drummer, Kinasz, Eddy, and Does 11-15 implemented and encouraged the aforementioned policies, customs, and/or practices with deliberate indifference to the rights of inmates to be protected from harm and to be rendered aid, assistance and treatment in accordance with the Eighth Amendment to the United States Constitution.

140.   At all relevant times, Defendants Washington, Artis, Drummer, Kinasz, Eddy, and Does 11-15, acting through the supervisory officials and/or officers, by their own policies, customs, and/or practices of systematically failing to enforce rules and regulations pertaining to the custody and detention of inmates, including Plaintiff, in violation of all standards of decency and minimum requirements under

the law and the Constitution, deprived Plaintiff of his rights to be protected from harm and to be rendered aid, assistance, and treatment in accordance with the Eighth Amendment of the United States Constitution.

141.   Defendants Washington, Artis, Drummer, Kinasz, Eddy, and Does 11-15 are liable for their intentional, deliberate, willful, wanton, reckless and/or grossly negligent acts and omissions, pursuant to the aforementioned customs, policies and/or practices, which resulted in an unlawful deprivation of Plaintiff's constitutional rights.

142.   As a direct and proximate cause of Defendants' constitutional violations, Plaintiff suffered, among other things, battery, as well as ongoing emotional and psychological trauma, mental anguish, pain and suffering, humiliation, degradation and other emotional injury.

**COUNT IV**
**FOURTEENTH AMENDMENT**
**Shocks the Conscience Deprivation of Substantive Rights**
**42 U.S.C. § 1983**
(*against all Defendants*)

143.   Plaintiff restates and incorporates here all previously stated allegations.

144.   Plaintiff had the right under the Fourteenth Amendment to be free from conduct that shocks the conscience, offending the canons of decency and fairness that express time-tested notions of justice.

145.   In violation of this right, Defendants engaged in grossly indecent abuse

of Plaintiff, by intentionally placing him in a position where it was foreseeable that he would be assaulted, and he was in fact assaulted.

146.  In violation of this right, Defendants engaged in grossly indecent abuse of Plaintiff, by intentionally delaying and failing to provide aid and medical care following a brutal assault.

147.  Defendants promulgated and/or carried out the acts and omissions, official policies, orders and directives described above intentionally and deliberately, with wanton and reckless disregard for the civil and constitutional rights, privileges, and sensibilities of Plaintiff.

148.  As a direct and foreseeable consequence of these policy decisions, failure to train and failure to intervene when a custom of constitutional violations was occurring, Plaintiff was deprived of his rights under the Fourteenth Amendment to the United States Constitution, and thereby suffered losses identified above.

## COUNT V
## GROSS NEGLIGENCE
(*against Defendants Drummer, Hutson, Kinasz, Eddy, Botos, and Does 1-10*)

149.  Plaintiff restates and incorporates here all previously stated allegations.

150.  Defendants had a duty to monitor/supervise Plaintiff and all others in his vicinity at all times in a manner that would not unreasonably expose Plaintiff to harm.

151.  Defendants failed to carry out reasonably necessary and obvious

procedures including regular rounds, careful observation of cameras, cell checks and counts, enforcement of basic rules about entry into cells and accessing alcohol, immediate investigation of bloodied facilities and an erratic, ranting, bloodied prisoner, scrambling emergency response or critical incident teams, summoning treaters and an ambulance, and/or rendering immediate and appropriate basic aid, when facts indicated a medical emergency was ongoing.

152.   Defendants failed in these regards and these failures were grossly negligent.

153.   Defendants' above omissions/acts occurred *after* the criminal assault of Plaintiff, and each act or omission contributed directly and with no other intervening cause to Plaintiff's worsening medical condition and outcomes.

154.   Moreover, many of the acts that caused Plaintiff harm were not judgment calls, but were by their nature mandatory and ministerial in nature.

155.   For all the reasons set forth here, there is no immunity of any kind applicable to the acts and omissions alleged.

156.   The above conduct was so reckless that it demonstrated a substantial lack of concern for Plaintiff's physical and emotional wellbeing.

157.   As a direct and proximate result of Defendants' actions, Plaintiff suffered exacerbation of the injuries inflicted by his assailant, attendant pain and physical harm, loss of function both temporary and permanent, emotional and mental

health harm, and other damages to be established in discovery.

158.   The acts and omissions alleged herein are so egregious that exemplary damages are warranted, for the reasons set forth above.

## RELIEF REQUESTED

Plaintiff requests all relief that is available to him in law and in equity, including:

a.   compensatory damages;

b.   non-compensatory damages;

c.   punitive damages, exemplary damages;

d.   attorney fees, costs and interest;

e.   an order setting conditions to ensure Defendants' future compliance with the U.S. Constitution's requirements regarding the protection of inmates from harm within the MDOC.

f.   All other equitable relief that may be available.

Respectfully submitted,
SALVATORE PRESCOTT PORTER
& PORTER, PLLC

Dated: December 19, 2024

/s/Sarah Prescott
Sarah S. Prescott (P70510)
Attorney for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spppllaw.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MAURICE D. BLACK,

     Plaintiff,

     v.

DIRECTOR HEIDI E. WASHINGTON
and WARDEN FREDEANE ARTIS, *in
their official capacities, and*
SERGEANT CHARLES DRUMMER,
SERGEANT STEVEN KINASZ,
SERGEANT KYLE EDDY,
CORRECTIONS OFFICER WILLIAM
BOTOS, CORRECTIONS OFFICER
PETE HUTSON, and MDOC
CORRECTIONS STAFF MEMBERS
JANE/JOHN DOES 1-14, *in their
individual capacities*,

Case No. 4:24-cv-13417
HON.

     Defendants.

---

Sarah S. Prescott (P70510)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
*Attorney for Plaintiff*
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@sppplaw.com

---

## **JURY DEMAND**

Plaintiff demands a trial by jury in this matter.

/s/Sarah Prescott
Sarah S. Prescott (P70510)
Attorney for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@sppplaw.com

Dated: December 19, 2024