UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAURICE D. BLACK,

Plaintiff,

v.

Case No. 24-cv-13417
Honorable Linda V. Parker

DIRECTOR HEIDI E. WASHINGTON, et al.,

Defendants.
_______________________________________/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON EXHAUSTION GROUNDS**

Plaintiff Maurice D. Black is a Michigan Department of Corrections ("MDOC") inmate. On April 10, 2022, while incarcerated at the Thumb Correctional Facility, he was brutally attacked and beaten by a fellow inmate, who then dragged Mr. Black's bloodied body to his cell. (ECF No. 25 at PageID.168.) The assault occurred in a windowed common room in broad daylight, allegedly within sight of prison guards and surveillance cameras. (*Id.*) Mr. Black claims prison officials neglected to intervene during the attack and then failed to render aid for nearly two hours, while he lay unconscious and in a pool of his own blood in his cell. (*Id.*; *see also id.* at PageID.180.)

The incident led to this civil rights action, which Mr. Black filed pursuant to 42 U.S.C. § 1983 on December 19, 2024. In an Amended Complaint filed on April

10, 2025, Mr. Black claims that the MDOC employees who were present during the incident and failed to protect and then render aid to him violated his Eighth Amendment right to be free from cruel and unusual punishment. Mr. Black further claims that certain MDOC officials are liable for failing to properly train and supervise corrections staff. Mr. Black asserts that Defendants' actions are so conscious shocking that they amount to a substantive due process violation under the Fourteenth Amendment and constitute gross negligence.

The matter is presently before the Court on Defendants' motion for summary judgment on exhaustion grounds. (ECF No. 35.) Defendants contend that Mr. Black failed to file a timely and proper administrative grievance with respect to the issues raised in this lawsuit, and that the action is therefore barred under the exhaustion requirement in the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Defendants' motion is fully briefed (ECF Nos. 39, 45), including supplemental briefing to address facts in Mr. Black's medical records not presented during the initial briefing (ECF Nos54, 55). For the reasons set forth below, the Court is denying Defendants' motion.

## I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248). The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

## II. Factual and Procedural Background

As indicated, on April 10, 2022, a fellow inmate brutally assaulted Mr. Black until he was rendered unconscious. Mr. Black was eventually transported to the Lapeer McLaren Hospital, where emergency room doctors noted "diffuse traumatic brain injury with loss of consciousness" and a "traumatic subdural hemorrhage" along with "contusion and laceration of right cerebrum" and "acute respiratory failure with hypoxia." (ECF No. 39-2 at PageID.569.) He was designated a "Level 1 Trauma" patient. (ECF No. 39-3 at PageID.607.)

Mr. Black was placed in a medically induced coma for at least three weeks. (*See* ECF No. 35 at PageID.333.) On or about May 4, 2022, once he tolerated being off a ventilator and no longer required intensive care, he was transferred to a secure unit for longer term care at the Duane Waters Health Care Center ("DWH") in Jackson, Michigan. (*Id*. at PageID.604-05.)

Around that time, Mr. Black was examined by Rashed Bashir, M.D., who completed a physician report in support of a state-court probate petition. (ECF No. 39-4.) Dr. Bashir diagnosed Mr. Black with a traumatic brain injury leading to vegetative state and indicated that he was "[t]otally bed bound" and had a "tracheostomy tube and feeding tube in place." (*Id*.) Dr. Bashir further noted that Mr. Black was "nonverbal, unable to have any communication verbally or in writing" and that the prognosis for improvement was "very poor." (*Id.*) According to Dr. Bashir, Mr. Black was incapable of making an informed decision as to where to live, consenting to support services, handling personal financial affairs, or authorizing or refusing medical treatment. (*Id.*)

Mr. Black remained at DWH until November 4, 2022. (*See* ECF No. 35-5.) In the interim, he apparently emerged from the coma by July 21, 2022, as he began making phone calls on that date. (ECF No. 35-6.) He also filed grievances concerning his care at DWH. (ECF No. 35-3; ECF No. 35-8.) One grievance, filed October 27, 2022, involved issues with his roommate. (*Id.*) A second, filed

October 31, 2022, related to his request to have his medications changed and to see a doctor. (*Id.*)

Nevertheless, Mr. Black was confused and disoriented long after awaking from the coma, and his memory was significantly impaired. (*See* ECF No. 39-5.) He could not remember names of family members, who his fiancée was, his access code to use the prison or hospital phone, or even that he had been at the Thumb Correctional Facility before being hospitalized, believing instead he was at the Macomb Correctional Facility where he had not lived for many years. (*Id.*) To this day, he continues to suffer from short-term and long-term memory loss, confusion, and disorientation. (*Id.*) When people tell him something, he immediately forgets and needs the information repeated, and he needs information repeated quite often. (*Id.*)

Mr. Black lacks first-hand knowledge of what happened to him on April 10, and even to this day has no memory of the assault or the events immediately preceding it. (*Id.*) When he first awoke from the coma, his mother and fiancé shared that he had been knocked out by another prisoner and had almost died. (*Id.*) A lot of details about the incident were missing, however. (*Id.*) For example, Mr. Black learned only later that an MDOC officer did multiple rounds, passing Mr. Black's cell each time and ignoring his unconscious and bloodied body, and that it

was almost two hours before an ambulance was called to take him to a hospital. (*Id.*)

Mr. Black's medical records support his lack of memory concerning the incident. A June 29, 2022 entry provides that "he has no memory of what led to him being at [DWH]." (ECF No. 52-1 at PageID.767.) A note in September states: "does not recall events from assault/hospitalization/acute illness but is able to recall more recent events as well as events prior to assault." (*Id.* at PageID.773.) Records in December state "[m]emory impairment observed," (*Id*. at PageID.779.)

During a telephone call on November 7, 2022, Mr. Black shared that he had "thanked everyone for the prayers." (ECF No. 35-9 at PageID.438.) He also talked about "get[ting a new lawyer to file a lawsuit from in here, the prison system, for what happened to me and everything." (*Id*. at PageID.442.) In another call on the same date, Mr. Black's mother told him that the attorney she has for him said he needed to request an MRI and a visit with a neurologist concerning his memory.[1] (ECF No. 35-10 at PageID.455-56.) She also told Mr. Black that he needs "to be on top of that paperwork" and that it is "very, very, very important." (*Id*. at PageiD.458.)

[1] In the transcript, the speaker is not identified; however, a phone call the next day makes it clear who was speaking.

During a telephone call with an unidentified female on November 8, 2022, the female asked Mr. Black if he did what his "mama asked [him] to do[.]" (ECF No. 35-11 at PageID.486.) Mr. Black responded: "That's what I called you for, too, to see if you remember what she said." (*Id.*) The female then reminded Mr. Black of his mother's instructions during the previous day's phone call. (*Id.* at PageID.486-87.) During this November 8 call, Mr. Black talked about how "three, four people who did something when it happened to me" (presumably referring to the attack), that "when they heard about what happened, everybody tell me what they did," and that "[e]verybody else didn't do nothing[.]" (*Id.* at PageID.494.)

About a month later, on December 11, 2022, Mr. Black filed a grievance concerning the April 10 incident. (ECF No. 35-3 at PageId.369.) By this date, Mr. Black had been moved to MDOC's Gus Harrison Correctional Facility. In the section of the grievance form asking for a statement of the problem, Mr. Black wrote that he was assaulted and dragged across base from the day room to his cell, where he was left to bleed for several hours, and unit officers ignored or disregarded the incident and failed to protect him. (*Id.*) In the section asking what attempt he made to resolve the issue prior to writing the grievance, Mr. Black wrote: "I was in a coma for five months and just recently regained some memory of the incident detail[ed] in the body of the grievance . . .." (*Id.*)

The officer responding to the grievance at Step I, whose name cannot be discerned from the document, rejected it, writing simply: "Untimely – Reject." (*Id.*) The officer failed to check a box to indicate whether Mr. Black had been interviewed. (*Id.*) In his Step II appeal, Mr. Black explained that he did not file his grievance within five business days of the incident because he had been in a medical coma and had loss of memory and only became aware of the incident described in the grievance on December 11, 2022. (*Id*. at PageID.367.) The denial was affirmed at Step II, with the following explanation: "You failed to file a grievance as soon as you were able and became aware of the issue." (*Id*. at PageID.368.) The decision was upheld at Step III, as well. (*Id*. at PageID.366.)

Meanwhile, Mr. Black filed this lawsuit. As indicated, Defendants now seek summary judgment on exhaustion grounds. Defendants maintain that Mr. Black's claims are barred because he failed to file a timely grievance, and the grievance he eventually filed failed to identify any particular defendant or assert the failure to train or supervise claim now alleged against executive and supervisory MDOC officials.

## III. Applicable Law

The PLRA provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that exhaustion must be in "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The Supreme Court also has held that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638-39 (2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)); accord, *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA").

The mandatory nature of the statute "means a court may not excuse a failure to exhaust, even to take [special] circumstances into account." *Ross*, 578 U.S. at 639 (citing *Miller v. French*, 530 U.S. 327, 337 (2000)) (explaining that "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion"). However, the Supreme Court has found that "that edict contains one significant qualifier: the remedies must indeed be 'available' to the prisoner." *Id.* As the Supreme Court explained, "the PLRA contains its own, textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement hinges on the 'availability' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* at 642 (brackets omitted).

The Court adopted the "ordinary meaning" of "available" in this context:

> " 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.' " [*Booth v. Churner*, 532 U.S. 731, 737-738 (2001)] (quoting Webster's Third New International Dictionary 150 (1993)); *see also* Random House Dictionary of the English Language 142 (2d ed. 1987) ("suitable or ready for use"); 1 Oxford English Dictionary 812 (2d ed. 1989) ("capable of being made use of, at one's disposal, within one's reach"); Black's Law Dictionary 135 (6th ed. 1990) ("useable"; "present or ready for immediate use").

*Ross*, 578 U.S. at 642. As such, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth*, 532 U.S. at 738). "Availability" is a fact-specific inquiry. *Lanaghan v. Koch*, 902 F.3d 683, 688 (7th Cir. 2018).

In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id*. at 643-44. The first is when the administrative process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 643 (citing *Booth*, 532 U.S. at 736). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* "In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. at 643-44. However, ambiguity in the process does not necessarily render a process unavailable, as the *Ross* Court explained:

> As the Solicitor General put the point: When rules are "so confusing that . . . no reasonable prisoner can use them," then "they're no longer available." . . . [However, t]he procedures need not be sufficiently "plain" as to preclude any reasonable mistake or debate with respect to their meaning. . . . When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion. But when a remedy is, in Judge Carnes's phrasing, essentially "unknowable"—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable. *See Goebert v. Lee County*, 510 F.3d 1312, 1323 (11th Cir. 2007); *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008) ("Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available").

578 U.S. at 644.

Finally, an administrative remedy is rendered unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 644. As the Supreme Court has recognized, "officials might devise procedural systems (including the blind alleys and quagmires . . . discussed) in order to 'trip up all but the most skillful prisoners.'" *Id.* (quoting *Woodford*, 548 U.S. at 102) (brackets omitted). Where "officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures[,]" those procedures a rendered "unavailable." *Id.*

Significantly, Circuit Courts of Appeals have not understood the three circumstances outlined in *Ross* to be exhaustive. *See, e.g., Romano v. Ulrich*, 49 F.4th 148, 154 (2d Cir. 2022) (citing *Williams v. Priatno*, 829 F.3d 118, 123 n.2

(2d Cir. 2016)); *Muhammad v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019) (identifying the examples in *Ross* as "*at least* three" of the circumstances where the administrative process may be "unavailable") (emphasis added); *Ramirez v. Young*, 906 F.3d 530, 538 (7th Cir. 2018) (concluding that *Ross*'s three circumstances "were only examples, not a closed list, and to the extent the district court thought they were the latter, it erred"); *Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017) (describing the three categories as "non-exhaustive"). As the Second Circuit reasoned, "the Supreme Court focused its analysis on circumstances 'relevant' to the facts before it" but "other circumstances might render a technically available administrative remedy effectively unavailable." *Rucker v. Giffen*, 997 F.3d 88, 93 (2d Cir. 2021) (citing *Williams*, 829 F.3d at 123 n.2). Although the Sixth Circuit Court of Appeals has not squarely said so, its decisions reflect that it, too, views the circumstances listed in *Ross* as non-exhaustive. *See, e.g., Coopwood v. Wayne Cnty.*, 74 F.4th 416, 424 (2023) (citing *Braswell v. Corrs. Corp. of Am.*, 419 F. App'x 622, 625-26 (6th Cir. 2011)) (discussing whether the grievance process became "unavailable" due to the plaintiff's personal mental capabilities or illness).

## IV. Analysis

The Court concludes that Defendants are not entitled to summary judgment on exhaustion grounds for two reasons. First, the Court finds a genuine issue of material fact as to whether Mr. Black's grievance was, in fact, untimely. Second,

the Court finds that MDOC's grievance procedures were not "available" to Mr. Black. Thus, he is excused from the PLRA's exhaustion requirements.

### A. Whether Mr. Black's Grievance Was Untimely

MDOC Policy Directive 03.02.130 governs the grievance process. It states:

> Q. Prior to submitting a written grievance, the grievant shall attempt to resolve the issue with the staff member involved within two business days *after becoming aware of* a grievable issue, unless prevented by circumstances beyond his/her control or if the issue is believed to fall within the jurisdiction of Internal Affairs. If the issue is not resolved, the grievant may file a Step I grievance. The Step I grievance must be filed within five business days after the grievant attempted to resolve the issue with appropriate staff.

(ECF No. 35-2 at PageID.356-57 (emphasis added).) The directive then instructs:

> S. . . . The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places, and names of all those involved in the issue being grieved are to be included.

(*Id*. at PageID.357.) Thus, the crucial question as to whether Mr. Black's grievance was timely is when he became "aware of" the issue grieved.

Mr. Black stated in his Step I grievance form that he did not attempt to resolve the issue prior to writing the grievance because he "just recently gained some memory of the incident detail[ed] in the body . . .." (ECF No. 35-3 at PageID.369.) He further described that, as a result of the assault, he was in a coma for five months and had permanent brain damage. (*Id.*) He elaborated in his appeals that he had been in a medical coma and experienced loss of memory and

that it was not until December 11, 2022 that he became aware of the incident in the body of his grievance. (*Id*. at PageID.367.)

Notably, it was not the assault, itself, that was the subject of Mr. Black's grievance. Rather, it was the failure of prison guards to protect him from the assault and then to provide medical attention after he was rendered bloodied and unconscious. He had to obtain information to conclude or believe that officers observed the attack and thereafter saw his injured body to become aware of the grieved issue.

Defendants' evidence does not show that Mr. Black became aware of facts relevant to those issues long before December 11, 2022. For example, the fact that Mr. Black "was awake enough to assault [a nurse] on July 22, 2022" (ECF No. 35 at PageID.336) has no bearing on his memory at all, much less on what he knew about the April 10 incident. Mr. Black's statements during phone calls, where he shared that he had thanked fellow inmates for their prayers and for intervening and recognized that other inmates did nothing, do not reveal when he became aware of what MDOC officers knew or did during and in response to the attack. The indication that a lawyer had been retained to file a suit related to the incident is not revealing, either, without information as to who the potential suit was against or for what conduct.

Mr. Black's ability to file grievances concerning his care at DWH, issues with his roommate, and medication changes also says nothing of his memory or knowledge of the April 10 incident. More importantly, it says nothing about when he became aware of the issues raised in this lawsuit. As circuit courts have observed:

> The ability to take advantage of administrative grievances is not an "either-or" proposition. Sometimes grievances are clearly available; sometimes they are not; and sometimes there is a middle ground where, for example, a prisoner may only be able to file grievances on certain topics.

*Kaba v. Stepp*, 458 F.3d 678, 685 (7th Cir. 2006); *see also Moss v. Harwood*, 19 F.4th 614, 622 (4th Cir. 2021) (agreeing that availability "is not an 'either-or' proposition).

But even if Mr. Black's filing of other grievances and his vague statements during telephone calls spoke to his wherewithal to file a grievance concerning the April 10 incident, the evidence identified by Mr. Black, including his declaration and medical records, would still create a genuine issue as to when he actually learned that prison guards were present and ignored the attack and then his injuries thereafter. Accordingly, the Court finds a genuine issue of material fact precluding summary judgment on exhaustion grounds.[2]

[2] The Court discusses *infra* Mr. Black's failure to identify Defendants in the grievance.

### B. The "Availability" of MDOC's Grievance Procedures

As several Circuit Courts have held, "administrative remedies are 'unavailable' to an inmate under the PLRA when (1) the inmate was unable to file a timely grievance due to physical or mental incapacity; and (2) the administrative system's rules do not accommodate the condition by allowing a late filing." *Smith v. Andrews*, 75 F.4th 805, 809 (8th Cir. 2023); *see also Rucker*, 997 F.3d at 93-94; *Smallwood v. Williams*, 59 F.4th 306, 314 (7th Cir. 2023); *Braswell*, 419 F. App'x at 625 (finding a genuine issue of material fact as to whether administrative remedies were available to the plaintiff due to his mentally impaired condition). In theory, perhaps, MDOC's grievance policies accommodated Mr. Black's physical and mental incapacities by calculating the grievance deadline based on his awareness of the grievable issue or by recognizing that circumstances beyond his control might interfere with the filing of a grievance. In practice, however, these accommodations were undisputedly ignored.

Specifically, there were clear indications in Mr. Black's grievance forms, including at Step I, that circumstances beyond his control interfered with his use of the grievance process. As indicated, he shared that he had been in a coma for five months, only recently regained some memory of the incident, and that the assault had caused permanent damage to his brain. Yet, there is nothing to suggest that the officer who reviewed Mr. Black's grievance at Step I or the officers who reviewed

his appeals engaged in any inquiry to assess when Mr. Black became aware of the grieved issue or when he regained the mental capacity to grieve the issue.[3] Instead, it appears that the grievance was deemed untimely simply because it was filed more than five or eight business days after the April 10 incident. As the Supreme Court articulated in *Ross*, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." 578 U.S. at 643 (citing *Booth*, 532 U.S. at 736).

Further, the Court says five or eight days because the record does not reflect what deadline the grievance officers used when deeming Mr. Black's grievance untimely. The Court itself is not even certain as to what deadline applied under the circumstances. As set forth above, Policy Directive 03.02.130 provides two deadlines relative to the grievance process, the second of which is calculated from the first: two days after becoming aware of the issue to attempt a resolution with the staff member involved and then five days from the attempted resolution's failure to submit a written grievance.

While the policy excuses the first deadline if circumstances beyond the inmate's control prevent the inmate from meeting it, the policy fails to inform an

[3] A conclusion that no inquiry was made is supported by the fact that the grievance was denied the day it was received.

inmate in that instance what the deadline is for filing his or her written grievance. In other words, the directive provides a deadline for filing a written grievance only when an attempted resolution is possible. And while the policy directive accounts for circumstances beyond the inmate's control with respect to his or her obligation to attempt resolution with the staff member, no such accommodation is set forth for inmates unable to file a timely written grievance for similar circumstances. For these reasons, MDOC's grievance policy is not simply "susceptible of multiple reasonable interpretations," it is "essentially 'unknowable'—so that no [inmate in Mr. Black's shoes] can make sense of what it demands[.]" *Ross*, 578 U.S. at 644 (citations omitted); *see also Goebert v. Lee Cnty.*, 510 F.3d 1312, 1323 (11th Cir. 2007) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)) ("That which is unknown and unknowable is unavailable; it is not 'capable of use for the accomplishment of a purpose.'").

Even when a grievance process is unavailable, the Sixth Circuit still requires the inmate to make "affirmative efforts to comply with the administrative procedures . . .." *Lamb v. Kendrick*, 52 F.4th 286, 293 (6th Cir. 2022) (quoting *Lee v. Willey*, 789 F.3d 673, 677 (2015)). "When a prisoner makes affirmative efforts to comply but does not succeed, [courts] analyze whether those efforts to exhaust were sufficient under the circumstances." *Id*. (quoting *Lee*, 789 F.3d at 677). Mr. Black attempted to grieve his issue through all three steps of MDOC's grievance

procedure. While Mr. Black did not name the specific officers involved, the Court cannot conclude that his efforts were insufficient under the circumstances.

The PLRA "does not impose a name-all-defendants requirement, and 'exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances.'" *Martin v. Sec'y of Corr.*, No. 3:16-cv-2060, 2018 WL 1158250, at *4 (M.D. Pa. Mar. 5, 2018) (quoting *Jones v. Bock*, 549 U.S. 199, 217, 219 (2007)). The inmate is required, however, to comply with the requirements of the specific prison's grievance system, *Jones*, 549 U.S. at 219, and MDOC's grievance policies require the inmate to provides the "names of all those involved in the issue" (ECF No. 35-2 at PageID.357). But courts excuse the failure to identify the individuals involved where it is not practicable. *See Martin*, 2018 WL 1158250, at *4 (citing *Spruill v. Gillis*, 372 F.3d 218, 234 (3d Cir. 2004)). And courts have found a grievance sufficient where information is provided that would enable prison officials to identify the individual or individuals involved. *See Glover v. Rivas*, No. 19-cv-13406, 2025 WL 975396, at *5 & n.5 (E.D. Mich. Mar. 31, 2025) (collecting cases). Notably, "[t]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." *Jones*, 549 U.S. at 219.

It is not evident that Mr. Black knew or had the practical ability to identify the officers who "ignored or disregarded" his injury by the time he filed his

grievance. He nevertheless provided information in his grievance sufficient for MDOC to identify the officers involved. As Mr. Black points out, MDOC already was alerted to a problem long before he filed his grievance, as it previously initiated an internal investigation with respect to the incident.

## V. Conclusion

In summary, the Court finds a genuine issue of material fact as to when Mr. Black was aware of the issues raised in his grievance, including the identity of the MDOC employees and officials involved, and when he was mentally capable of complying with the prison's grievance procedures. The Court also finds that those procedures were "unavailable" to him.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment on exhaustion grounds (ECF No. 35) is **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 23, 2026